# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| JEREMY MICHAEL BOGGS, <br>     Plaintiff, <br><br> v. <br><br> MAJOR GEORGE HEMBREE, et al., <br>     Defendants. | Civil Action No. 7:17cv00426 <br> **MEMORANDUM OPINION** <br><br> By: Hon. Pamela Meade Sargent <br> United States Magistrate Judge |

Jeremy Michael Boggs, ("Boggs"), an inmate previously housed in the Southwest Virginia Regional Jail, ("SWVRJ"), in Duffield, Virginia, filed this case pursuant to 42 U.S.C. § 1983. By Amended Complaint, (Docket Item No. 34), Boggs sues SWVRJ employees Major George Hembree, Captain Brian Parks, Sergeant Justin Dockery, Sergeant Todd Elam and Officer Lawson. Boggs also sues Laura Summers and Mediko, Inc.,[1] ("Mediko").

This matter is before the court on the Motion To Dismiss filed by the defendants Hembree and Parks, (Docket Item No. 39), the Motion To Dismiss filed by the defendants Dockery, Elam and Lawson, (Docket Item No. 51), Defendant Laura Summers, QMHP's Motion For Summary Judgment, (Docket Item No. 52), and Defendant Mediko, PC's Motion For Summary Judgment, (Docket Item No. 54) (collectively, "Motions"). The plaintiff has responded to the Motions, (Docket Item No. 57), and various defendants have filed replies, (Docket Item Nos. 59, 60). Therefore, the Motions are ripe for decision.

---

[1] In his Amended Complaint, Boggs sued "Medico, Inc." On its waiver of service form, this entity identified itself as Mediko, PC. (Docket Item No. 43.)

## I. Facts

In his Amended Complaint, Boggs alleged that defendants Hembree and Parks kept him in segregation resulting in long-term psychological issues that continue to require treatment. Boggs also alleged that Hembree and Parks were deliberately indifferent toward him. Boggs alleged that defendants Dockery, Elam and Lawson sexually harassed him by calling him a "faggot" and a "white supremacist," making a "limp wristed Hitler salute" to him and cursing him. He also alleged that one of the defendants made a gesture by grabbing his own groin. He alleged that the the jail employees' actions attempted to intimidate him because of his sexual preference, causing him mental and emotional anxiety. Boggs further alleged that defendants Summers and Mediko denied him mental health treatment and even instructed him to stop writing them with requests for help. Boggs seeks monetary damages.

Summers has filed an affidavit in support of her motion for summary judgment. (Affidavit of Laura Summers, MA, QMHP, (Docket Item No. 53-1) ("Summers Affidavit")). In this affidavit, Summers stated that she has a master's degree in human services and is a Qualified Mental Health Professional, ("QMHP"). (Summers Affidavit at 1.) Summers stated that she has worked with the Virginia Department of Corrections, ("VDOC"), as an independent contractor providing mental health care and treatment to inmates housed at SWVRJ since April 18, 2016. (Summers Affidavit at 1.) Summers stated that, to make a request to be seen by mental health staff at SWVRJ, an inmate submits a request through a kiosk in his room. (Summers Affidavit at 2.) Summers said that these requests are then processed and answered by members of the medical staff. (Summers Affidavit at 2.)

Summers stated that Boggs was incarcerated at SWVRJ beginning on May 21, 2016. (Summers Affidavit at 2.) She said that Boggs submitted his first request for a mental health evaluation on January 3, 2017, and she answered Boggs's request within 24 hours and informed him that he had been placed on the list to be seen by the coordinator. (Summers Affidavit at 2.) Summers said that Boggs sent a second request on January 8, 2017, asking if he was on the list to be seen, and she responded the following day, advising him that he would first be seen by the coordinator. (Summers Affidavit at 2.) Boggs submitted a third request on January 12, 2017, Summer said, and, within an hour of his request, she asked him about his specific complaints. (Summers Affidavit at 2.) Summers said that Boggs responded five days later on January 17, 2017, that he "need[ed] someone to talk to." (Summers Affidavit at 2.)

Summers said that she, subsequently, visited Boggs later in the day on January 17, and he told her that he was being transferred to a different correctional facility and that he did not wish to see the psychiatrist at SWVRJ. (Summers Affidavit at 2.) Summers said that she told Boggs that he could request to be seen again in the future if he returned to SWVRJ. (Summers Affidavit at 2.) A Mental Health Sick Call record dated January 17, 2017, and attached to Summers's affidavit documented this interaction. (Summers Affidavit at 44.) On February 28, 2017, Boggs filed another request stating that he had requested help on January 17, 2017, and that he had not been seen and his post-traumatic stress disorder was getting worse. (Summers Affidavit at 2.) Summers said that she replied to Boggs on March 2, 2017, telling him that he needed to renew his request to be seen by the psychiatrist. (Summers Affidavit at 2.) She said that Boggs submitted this request on March 4, 2017, and she informed him that he would be placed on the list. (Summers Affidavit at 2.) She said Boggs submitted another similar request later

on the same day, and she, again, informed him that he was on the list to be seen. (Summers Affidavit at 3.)

Summers stated she requested Boggs to come to mental health for an assessment on April 10, 2017. (Summers Affidavit at 3.) She said that Boggs refused and wrote "problem solved" on his refusal form. (Summers Affidavit at 3.) Summers said Boggs escaped while he was on work release during the summer of 2017. (Summers Affidavit at 3.) She said that he eventually was found and re-booked into SWVRJ. (Summers Affidavit at 3.) Boggs submitted two duplicate requests for a mental health consult on July 14, 2017, she said. (Summers Affidavit at 3.) Summers said that she placed Boggs on the list to be seen and assured him that he would be seen as soon as possible. (Summers Affidavit at 3.) She said Boggs filed this lawsuit against her on July 29, 2017. [2]

Summers said that she saw Boggs on August 7, 2017, and he complained of depression, poor sleep, nightmares and panic. (Summers Affidavit at 3.) Summers said she recommended that Boggs be prescribed medication for depression and submitted a referral for him to see the psychiatrist. (Summers Affidavit at 3.) As a QMHP, Summers said, she cannot prescribe medications, but, instead, makes recommendations to the psychiatrist based upon her assessments. (Summers Affidavit at 3.) Summers said that, after the August 7 appointment with Boggs, he submitted four additional requests about needing to see the psychiatrist and she

---

[2] The court's record reflects that Boggs filed this suit on September 13, 2017, and that Summers was not added as a party defendant in this case until Boggs filed the Amended Complaint on February 28, 2018. Boggs did file an earlier action against Summers on August 9, 2017, (Civil Action No. 7:17cv00032), which was dismissed without prejudice on February 20, 2018.

responded to each request with an "assurance" that he was on the list to be seen. (Summers Affidavit at 3.)

Summers said the psychiatrist evaluated Boggs on October 24, 2017. (Summers Affidavit at 3.) Since his initial meeting with the psychiatrist, Summers said, Boggs had submitted six kiosk requests, to each of which she had timely responded. (Summers Affidavit at 3.) She said that SWVRJ inmates were scheduled to be seen for follow-up appointments with the psychiatrist every 90 days. (Summers Affidavit at 3.) Summers stated that Boggs was scheduled to be seen for his follow-up appointment in mid-January 2018. (Summers Affidavit at 3.)

Summers said she personally visited and assessed Boggs on January 17, 2017, and, again, on August 8, 2017. (Summers Affidavit at 4.) She said that Boggs refused her assessments on two other occasions. (Summers Affidavit at 4.) Summers said that Boggs visited the psychiatrist on October 24, 2017, and that, since that date, he continued to submit requests via the kiosk, to which she responded. (Summers Affidavit at 4.) She stated that she was never deliberately indifferent to any of Bogg's medical needs. (Summers Affidavit at 4.)

Summers attached Boggs's mental health records to her affidavit. (Summers Affidavit at 5-109.) These records contain a May 23, 2016, Admission Medical History and Physical, which stated that Boggs was not then taking any psychotropic medication. (Summers Affidavit at 5.) This report also noted that Boggs denied any thoughts of suicide or suicide attempts in the past. (Summers Affidavit at 7.) It also noted that Boggs denied ever being treated for any mental health problems. (Summers Affidavit at 7.) These records also contain a July 6,

2017, Receiving Screening, on which Boggs indicated that he was then experiencing depression. (Summers Affidavit at 16.)

A Brief Jail Mental Health Screen form dated July 6, 2017, noted that Boggs made no mental health complaints. (Summers Affidavit at 52.) It also stated that Boggs denied ever being in a hospital for emotional or mental health problem. (Summers Affidavit at 52.)

These records also contain an August 1, 2017, Mental Health Sick Call note stating that Boggs had written Summers telling her to "do her job." (Summers Affidavit at 44.) Summers noted that she spoke with Boggs, who was aggravated and angry, and she explained the mental health waiting list process to him. (Summers Affidavit at 44.) She noted that Boggs said he had sent messages to mental health each month that were ignored. (Summers Affidavit at 44.) Summers noted that she reviewed the messages she had received from Boggs, and she found she had responded to each message; she also stated that Boggs had not submitted any requests from March to July 11, 2017. (Summers Affidavit at 44.) Summers also noted that she had requested Boggs to come to mental health to see her on April 10, 2017, but Boggs signed a refusal form, stating "problem solved." (Summers Affidavit at 44.)

A Mental Health Sick Call note dated August 7, 2017, stated that Summers evaluated Boggs on that date and assessed him with an adjustment disorder. (Summers Affidavit at 43.) Summers noted that she scheduled Boggs to see the psychiatrist. (Summers Affidavit at 43.) The Mental Health Appraisal form from this date stated that Boggs complained of being very depressed, difficulty getting out of bed, not sleeping well, nightmares, anxiety, panic attacks and feeling

claustrophobic. (Summers Affidavit at 46.) Boggs denied having any suicidal or homicidal ideations or hallucinations. (Summers Affidavit at 46.) Boggs stated that he also experienced loss of interest, racing thoughts, restlessness and apprehension. (Summers Affidavit at 47.)

Boggs reported being diagnosed previously with bipolar disorder. (Summers Affidavit at 46.) On this occasion, Boggs stated that he previously had received both inpatient and outpatient mental health treatment and medication. (Summers Affidavit at 48.) He stated that he had been treated at The Laurels, in Lebanon, Virginia, the previous year and was prescribed Suboxone and something for anxiety. (Summers Affidavit at 48.) On this occasion, Boggs stated that he had a history of abusing methamphetamine and cocaine. (Summers Affidavit at 48.)

Summers noted that Boggs's appearance, behavior, speech, mood, thought processes, perceptions and cognitive functioning were all within normal limits. (Summers Affidavit at 49-50.) She noted that Boggs had fair judgment/insight, and she diagnosed Boggs as suffering from an adjustment disorder. (Summers Affidavit at 50.) She scheduled a consult for Boggs with the psychiatrist. (Summers Affidavit at 50.)

A Psychiatry Progress Note dated October 24, 2017, documented that Dr. Bruce Stevens, M.D., evaluated Boggs on that date. (Summers Affidavit at 53-55.) Dr. Stevens noted that this was Boggs's initial psychiatric evaluation. (Summers Affidavit at 53.) He stated that Boggs was serving a sentence for felony eluding when he became high on methamphetamine while on work release and escaped. (Summers Affidavit at 53.) Dr. Stevens noted that Boggs provided a history of polysubstance dependence, including benzodiazepines, cocaine, methamphetamine

and stimulants and a previous diagnosis of bipolar disorder. (Summers Affidavit at 53.) Dr. Stevens noted that he reviewed Boggs's medical, social and family history with the QMHP. (Summers Affidavit at 53.) Dr. Stevens also noted that Boggs was alert, well-groomed, cooperative, with appropriate behavior, normal rate, quantity and quality of speech, depressed and anxious mood, euthymic and constricted affect, logical/linear, goal-directed thought processes and no delusional thought content or hallucinations. (Summers Affidavit at 53-54.) Dr. Stevens diagnosed polysubstance dependence, adjustment disorder with depression and anxiety disorder. (Summers Affidavit at 55.) He stated that Boggs did not exhibit evidence of bipolar disorder. (Summers Affidavit at 55.) He prescribed Pamelor for depression and noted that Boggs should follow up with him in three months. (Summers Affidavit at 55.)

These records also support Summers's statements regarding her communications through the kiosk with Boggs. These records also contained an October 28, 2017, communication from Boggs that stated that his "meds are not doing anything for my anxiety… please help me." (Summers Affidavit at 35.) Mental health responded, "You've not even taken the medication for a week. It often takes 4-6 weeks or longer for the medication to get into your system." (Summers Affidavit at 35.) On November 3, 2017, Boggs wrote:

> I have been on nortriptyline 100 mg for a month. I apologize if I am an inconvenience or a pain[.] I have only had mental problems from my ptsd [post-traumatic stress disorder] previously from Tuesday September 11th and the events I witnessed. I have been having horrible graphic nightmares about death and disaster all around me and awake shaking in a cold sweat….

(Summers Affidavit at 36.) Mental health responded:

> Mr. Boggs, you were on Nortriptyline 50 mg and the psychiatrist increased it to 100 mg. It takes several weeks to fully get into your system. Right now, this is all that you will be prescribed per the psychiatrist. We can discuss any changes during your follow up appointment with him.

(Summers Affidavit at 36.)

On November 17, 2017, Boggs asked to be placed on the list to see mental health, and he was informed he already had an appointment scheduled. (Summers Affidavit at 37.) On December 27, 2017, Boggs inquired when he would get to see mental health or the psychiatrist; he was informed that he had a follow-up appointment scheduled for mid-January. (Summers Affidavit at 38.) On December 29, 2017, Boggs wrote: "Thanks for denied mental health treatment after repeatedly asking for help here. I have [subpoenaed] all kiosk records for my civil suit." (Summers Affidavit at 39.) The response was "OK – I'm not sure what you have been denied, though. Please explain – you are currently being treated. Each patient is seen every 90 days, and your 90 day follow up is coming up in mid-January, just as I've told you." (Summers Affidavit at 39.) Boggs wrote back: "The only thing done was the dr messed up my pain meds," to which mental health responded, "I'm sorry, the treatment is at the discretion of the psychiatrist. He increased medication, but if you would like it changed, we can discuss this with him during your follow up." (Summers Affidavit at 40.)

Neither Boggs's Amended Complaint nor his response to the Motions is sworn or made under penalty of perjury. In his response, Boggs stated that defendants Hembree and Parks were "at the top of the chain of command there at

the jail and had total control of every aspect of my housing in the … SHU [segregation housing unit]….” (Docket Item No. 57 at 2.) He also stated, "Murderers were permitted to be in population as were 7 other inmates with escape charges. Therefore, I was treated indifferent by them both." (Docket Item No. 57 at 2.) Boggs also stated that defendant Lawson could be "seen on video" giving him a limp-wristed gesture multiple times and calling him a gay white supremacist and a "faggot." (Docket Item No. 57 at 2.) Boggs stated he had filed requests for video footage and officer's statements, but had not received any response.[3] (Docket Item No. 57 at 2.)

Boggs submitted a VDOC pamphlet on the Prison Rape Elimination Act with his response to the Motions. (Docket Item No. 57-1.) This pamphlet states, in part:

> The Virginia Department of Corrections … is committed to and has adopted a **ZERO-TOLERANCE** standard for sexual abuse and/or harassment of offenders….
> …
> Sexual misconduct is defined as any behavior of a sexual nature between:
> … Staff (including contract staff) and offenders ….
> …
> Behavior of a sexual nature includes:
> …
> … Sexual harassment….

(Docket Item No. 57 at 4-5.) (Emphasis in original.)

---

[3] By Order dated February 6, 2018, the court stayed discovery in the case. (Docket Item No. 32.) Boggs filed a Request for Production of Documents with the court on January 10, 2018. (Docket Item No. 23.) The court's review of this document shows that many of the items requested have little, if any, connection to the claims Boggs raises in this case.

*II. Analysis*

The defendants Hembree, Parks, Dockery, Elam and Lawson argue that, pursuant to Federal Rules of Civil Procedure Rule 12(b)(6), Boggs's Amended Complaint fails to state a claim against them. Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6) (2018). Rule 12 also states that, if matters outside of the pleadings are presented to the court on a Rule 12(b)(6) motion, the motion must be treated as a motion for summary judgment. *See* FED. R. CIV. P. 12(d) (2018). Here, none of the parties have submitted any additional materials for the court's consideration on the motions to dismiss. Therefore, the court will decide the motions to dismiss based on the facts alleged in the Amended Complaint.

In *Bell Atlantic Corp. v. Twombly*, the Supreme Court stated that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). Additionally, the Court established a "plausibility standard" in which the pleadings must allege enough to make it clear that relief is not merely conceivable but plausible. *See Twombly*, 550 U.S. at 555-63.

The Court further explained the *Twombly* standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009):

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. … Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. …
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

(Internal citations omitted).

Also, pro se complaints are held to a less stringent standard then those drafted by counsel. *See Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Furthermore, the court should liberally construe a complaint filed by a pro se litigant to allow the development of a potentially meritorious case. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). The requirement to liberally construe a pro se complaint does not mean, however, that the court may ignore a clear failure to plead sufficient facts to support a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

The defendants Summers and Mediko have filed motions for summary judgment, supported by Summers's affidavit and attached exhibits. With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and

the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a) (2018); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, Civil Action No. 3:09cv00056, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

In their motions to dismiss, defendants Hembree and Parks argue that Boggs's Amended Complaint fails to state a claim against them for cruel and unusual punishment. They also argue that Boggs has failed to plead any personal involvement on their part. Further, they argue that they are entitled to qualified immunity from Boggs's claims.

The entirety of Boggs's Amended Complaint allegations against Hembree and Parks are that they kept Boggs in segregation and caused him psychological injury. Even if the court considers the facts alleged by Boggs in his response to the Motions, Boggs added only allegations that Hembree and Parks were at the "top of the chain of command … at the jail and had total control of every aspect of my housing" in segregation.

The Fourth Circuit has held that "segregated confinement is not per se unconstitutional." *Allgood v. Morris*, 724 F.2d 1098, 1101 (4th Cir. 1984) (citing *Sweet v. S.C. Dep't. of Corr.*, 529 F.2d 854, 861 (4th Cir. 1975)). Furthermore, various courts, including this one, have held that, inmates generally do not have a liberty interest in a particular security classification or in freedom from segregation. *See Shelton v. Angelone,* 183 F. Supp. 2d 830, 838-39 (W.D. Va. 2002); *Drummer v. Luttrell,* 75 F. Supp. 2d 796, 799 (W.D.Tenn. 1999); *Sandefur v. Lewis,* 937 F. Supp. 890, 894 (D. Ariz. 1996). Similarly, the court in *Templeman v. Gunter,* 16 F.3d 367, 369 (10th Cir. 1994), held that a change in classification does not create a liberty interest because an inmate is not entitled to a particular degree of liberty while incarcerated. Essentially, given a valid conviction, a criminal defendant has been constitutionally deprived of his liberty to the extent that a state may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. *See Meachum v. Fano,* 427 U.S. 215, 224 (1976).

In this case, Boggs has not alleged any facts that would state a claim for violation of his constitutional rights by Hembree and Parks placing him in segregation. In particular, Boggs has not alleged that the conditions of segregation confinement at SWVRJ were such that they amounted to cruel and unusual

punishment. *See Sweet*, 529 F.2d at 860-61. As stated above, an inmate has no liberty interest in a particular security classification, therefore, Boggs's Amended Complaint does not state a claim for violation of his due process rights. *See Sandin v. Conner,* 515 U.S. 472, 477–78 (1995) (initial inquiry in any due process claim is whether the plaintiff has demonstrated that he has been deprived of a protected liberty interest).

While it appears that Boggs may be claiming that he was treated differently from other similarly situated inmates, in that he alleges that other inmates with escape charges were not housed in segregation, that allegation standing alone does not state a claim for violation of his equal protection rights. A prisoner also must allege that the unequal treatment resulted from intentional or purposeful discrimination. *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Thus, even assuming that all Boggs's factual allegations contained in the Amended Complaint are true, it fails to state a claim for relief against Hembree and Parks for a constitutional violation. The fact that Boggs has not adequately pleaded a constitutional violation against Hembree and Parks also entitles them to qualified immunity from his claims. *See Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994) (if there is a legitimate question as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity). Therefore, I will grant their motion and dismiss Boggs's claims against them.

In their motion to dismiss, defendants Dockery, Elam and Lawson argue that Boggs's Amended Complaint alleges no more than verbal harassment against them, and that verbal harassment, without more, does not state any constitutional claim. In his Amended Complaint, Boggs alleged that these defendants called him derogatory slurs and made derogatory gestures toward him based on his sexuality

and otherwise. He also alleged no more than this against these defendants in his response to their motion. These defendants correctly argue that allegations of verbal abuse or harassment, gestures and, even, verbal threats, without more, do not state a constitutional claim. *See Moody v. Grove*, 885 F.2d 865, 1989 WL 107004 at *1 (4th Cir. Sept. 19, 1989); *Fisher v. Woodson*, 373 F. Supp. 970, 973 (E.D. Va. 1973). Again, because the conduct alleged, no matter how unsavory or unprofessional, does not rise to the level of a constitutional violation, these defendants also are entitled to qualified immunity. *See Wiley*, 14 F.3d at 995.

The defendants also correctly argue that the Prison Rape Elimination Act, ("PREA"), does not provide prisoners with any private cause of action. "The PREA statute acknowledges that prison rape is a problem and establishes a construct for federal, state, and local prisons to address that problem. *See* 34 U.S.C. §§ 30301-30309. It does not, however, create a cause of action for individual inmates who may have been victimized to bring suit against a jailer. *Farley v. Clarke*, No. 7:15cv352, 2016 WL 8540135, at *6 (W.D. Va. Dec. 27, 2016); *see also Muhammad v. Barksdale*, No. 7:15cv541, 2016 WL 627359, at *2 n.2 (W.D. Va. Feb. 16, 2016) ("Muhammad does not assert any separate legal claim against defendants under PREA itself, nor could he do so."); *Chapman v. Willis*, No. 7:12cv389, 2013 WL 2322947, at *4 (W.D. Va. May 28, 2013) ("There is no basis in law for a private cause of action under § 1983 to enforce a PREA violation"). Therefore, Boggs's allegations do not give rise to a private cause of action against these defendants under PREA.

Boggs's allegations against these defendants also do not state a claim for retaliation, in that Boggs has not alleged that these defendants' actions were intended to be in retaliation for Boggs's exercise of a specific constitutional right.

To state a claim for retaliation, a prison inmate must allege that: (1) he was engaged in a constitutionally protected activity; (2) a defendant took some action that adversely affected the inmate; and (3) there was a causal relationship between the inmate's protected activity and the defendant's conduct. *See Booker v. S.C. Dep't. of Corr's.*, 583 F. App'x 43, 44 (4th Cir. 2014) (citing *Constantine v. Rectors & Visitors of George Mason Univ.* 411 F.3d 474, 499 (4th Cir. 2005)). I interpret Boggs's Amended Complaint to allege that, *as a result of these defendants' actions*, Boggs filed a PREA complaint and a retaliation complaint against them. Boggs's Amended Complaint does not allege that these defendants took the alleged action *in retaliation for* his filing any previous complaint against them or anyone else. Therefore, for these reasons, I also will grant these defendants' motion and dismiss Boggs's claims against them.

Defendants Summers and Mediko have filed motions for summary judgment. In her motion, Summers argues that there is no genuine dispute of material fact and that she is entitled to judgment as a matter of law because she was not deliberately indifferent to Boggs's mental health needs. Based on the evidence before the court, I agree. In his Amended Complaint, Boggs alleged only that Summers and Mediko denied him mental health treatment and told him to stop writing them with requests for help. Boggs made no allegations concerning these defendants in his response to the Motions.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also "protects inmates from inhumane treatment and conditions while imprisoned." *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Godfrey v.*

*Russell*, Civil Action No. 7:14cv00476, 2015 WL 5657037, at *8 (W.D. Va. Sept. 24, 2015) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)); *Chapman v. Rhodes*, 434 F. Supp. 1007, 1020 (S.D. Ohio 1977), *aff'd*, 624 F.2d 1099 (6th Cir. 1980), *rev'd on other grounds*, 452 U.S. 337, 344 (1981). For a prisoner to prevail on a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. Mere disagreement with the prescribed treatment or, even, medical malpractice, does not rise to the level of deliberate indifference to prove a constitutional claim. *See Estelle*, 429 U.S. at 103; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). In essence, treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).

Through her affidavit, Summers has provided evidence to the court that she responded to each of Boggs's requests for treatment, assessed his condition and arranged for him to be seen by the psychiatrist for further treatment. As stated above, in light of this evidence, Boggs cannot simply rely on the allegations contained in his pleadings without offering evidence demonstrating a genuine dispute in fact. *See Anderson*, 477 U.S. at 256-57; *Oliver*, 2010 WL 1417833, at *2. Nonetheless, Boggs has provided the court no evidence to support his claim against Summers. Therefore, I will grant Summers's motion and enter summary judgment in her favor.

In its motion, Mediko argues that it is entitled to the entry of summary judgment in its favor because Boggs has failed to provide any evidence against Mediko to demonstrate deliberate indifference to his serious medical need. As

stated above, a party may be entitled to the entry of summary judgment in its favor if there is an absence of evidence to support the nonmoving party's case. *See Lexington-South Elkhorn Water Dist.,* 93 F.3d at 233. A corporation, such as Mediko, cannot act except through its agents or employees. *See Miller and Rhoads v. West*, 442 F. Supp. 341, 344 (E.D. Va. 1977). Boggs has provided the court with no allegation, much less evidence, of the involvement of any employee or agent of Mediko being involved in his psychological treatment, or lack of treatment. Therefore, the court will grant its motion and enter summary judgment in Mediko's favor. I further note, that, even if Boggs had offered evidence that Summers was an employee or agent of Mediko, the evidence before the court is undisputed and would require the entry of summary judgment in its favor.

The court will enter an appropriate Order and Judgment.

**ENTERED:** November 14, 2018.

*s/ Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE